IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES *ex rel.* AMBER ARTHUR,

    *Relator,*

    v.

THD AMERICA, INC.,

    *Defendant.*

Civil No. ELH-16-2571

**MEMORANDUM OPINION**

In this qui tam action,[1] filed on July 14, 2016, the Relator, Amber Arthur, sued her former employer, THD America, Inc. ("THD"), pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3728 *et seq. See* ECF 1 ("Complaint"). Relator also sued THD S.p.A., the parent company of THD America, Inc., and five doctors. ECF 1, ¶¶ 10–15.[2]

At the relevant time, THD sold "medical devices and services to distributors that have contracts with federal agencies." *Id.* ¶ 8. Arthur, who previously worked as a sales representative for THD, was terminated from employment on July 1, 2015. *Id.* ¶ 152. She alleges that defendants knowingly submitted false or fraudulent claims to the Medicare Program, 42 U.S.C. § 1395 *et seq.* ("Medicare"), a federally funded health insurance program for people ages 65 and older and for certain people with disabilities. In addition, she alleges that defendants committed "acts in direct retaliation for Relator's efforts to reveal and properly disclose" defendant's illegal conduct. ECF

---

[1] "Qui tam is short for '*qui tam pro domino rege quam pro se ipso in hac parte sequitur*,' which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007).

[2] The Relator sometimes refers to the parent as "SpA." *See, e.g.,* caption; ECF 1 at 5.

1 at 54.[3]

As discussed, *infra*, the case was unsealed on September 1, 2024.  ECF 64.  Then, with the exception of THD, the Relator dismissed the suit as to all defendants on December 10, 2024.  ECF 74.  Thereafter, on March 7, 2025, the Relator filed a Third Amended Complaint.  ECF 81 ("Third Amended Complaint" or "TAC").

THD has moved to dismiss the Third Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(5), alleging untimely service.  ECF 101.  It is supported by a memorandum (ECF 101-4) (collectively, the "Motion") and two declarations (ECF 101-2, ECF 101-3).  The Relator opposes the Motion.  ECF 105.  Her submission is supported by a memorandum (ECF 105-1) (collectively, the "Opposition") and one declaration (ECF 105-2).  Defendant replied.  ECF 106 (the "Reply").

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.    Factual and Procedural Background

On July 14, 2016, Relator filed suit against her former employer, THD, along with its parent company and five doctors, alleging that defendants knowingly submitted false and fraudulent claims to Medicare, in violation of 31 U.S.C. § 3729.  ECF 1.  Relator also alleged that defendants engaged in acts of retaliation against her, in violation of 31 U.S.C. § 3730.  The Complaint contains four counts, all under the False Claims Act:  (1) violation of 31 U.S.C. § 3729(a)(1)(A); (2) violation of 31 U.S.C. § 3729(a)(1)(B); (3) violation of 31 U.S.C. § 3730(h); and (4) violation of 31 U.S.C. § 3729(a)(1)(C).  As noted, Arthur dismissed the suit as to all

---

[3] Throughout the Memorandum Opinion, the Court cites to the electronic pagination.  However, the electronic pagination does not necessarily correspond to the page number imprinted on a particular submission.

defendants, except THD, in December 2024.  ECF 74.  Thus, THD is the only remaining defendant. *Id.*

According to the Relator, THD violated the FCA by committing violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b)(2)(A) and (B).  *Id.* at 20–46.  The AKS "imposes criminal penalties on anyone who knowingly and willfully offers to pay or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind for a variety of reasons."  *Id.* ¶ 16.  Relator also alleges violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, through off-label marketing. *Id.* at 46–50.  The FDCA "states that companies may not market medical devices in the United States without prior approval from the Food and Drug Administration ('FDA') for the device's intended use."  *Id.* ¶ 36.

The allegations pertain to Transanal Hemorrhoidal Dearterialization, a multi-step surgical procedure for the repair of internal hemorrhoids.  *Id.* ¶ 41.  It is offered as a minimally invasive alternative to a hemorrhoidectomy and procedure for prolapse and hemorrhoids.  *Id.* ¶ 39.  THD received clearance from the FDA for the THD Slide One Kit in 2009.  *Id.* ¶ 40.  Relator alleges that between 2008 and 2015, THD sold 29,849 kits to public and private hospitals.  *Id.* at 20 n.3. Up to 80 percent or more of these kits were billed to Medicare or another government insurance carrier.  *Id.* ¶ 42.

The THD Slide One Kit requires use of a THD generator as a power source and a light source.  *Id.* ¶ 44.  Relator alleges that THD offered facilities either to purchase the generators or receive them from THD on loan.  *Id.* ¶ 45.  Through the loan program, the generator was offered to facilities indefinitely and for free.  *Id.* ¶ 47.  But, Relator alleges that, to receive the loaner generator, the Loan Generator Program required facilities to purchase a minimum of ten THD Kits,

at a cost of $5,230 each, and to purchase subsequent kits in batches of at least ten. *Id.* ¶ 48. In contrast, the Purchase Generator Program required an initial order of five THD Kits, with reorders permitted on an individual basis. *Id.*

According to Arthur, if facilities could not commit to the minimum initial order, the sales representatives would not offer the loaner generator. *Id.* ¶ 49. And, if facilities did not continually repurchase more kits, THD would inform them that, "should they fail to purchase additional THD kits in the near future," they would need to return the loan generator. *Id.* ¶ 50. Relator also claims that once facilities purchased a minimum quantity of THD Kits and received the loaner generator, the sales representatives would "begin engaging in aggressive sales tactics, off-label promotion, and the offer of additional forms of kickbacks in order to persuade the facilities to convert all of their hemorrhoid procedures to THD." *Id.* ¶ 49.

In early 2014, THD launched the Centers of Excellence Program. *Id.* ¶ 54. According to Relator, the program's purposes were: "(1) to reward physicians who perform high volumes of THD procedures, (2) to train physicians to use the THD procedure, and (3) to recruit more physicians to participate in the Centers of Excellence Program." *Id.* The facilities that took part in the program "received paid consulting agreements and free internet marketing to solicit patient referrals." *Id.* ¶ 55. Relator alleges that THD actively directed "patients to Centers of Excellence doctors over physicians and facilities who are not high-volume and do not market the THD procedure as the 'standard of care.'" *Id.* ¶ 56. According to Relator, "standard of care" was understood to include Stage 4 procedures. *Id.* at 24 n.8. But, "[s]tage 4 hemorrhoids are a more serious condition for which the THD system did not gain approval until February 2015." *Id.* at 21 n.4.

In the Complaint, Relator also details how sales representatives offered physicians free advertisements and marketing for the recruitment of additional patients who would use the THD procedure. *Id.* ¶ 68. This could include being listed on THD's website, free advertisements on Google, patient brochures, customizable posters, and letters prepared by THD to send to referring doctors, such as primary care physicians, "in order to drive more patients to their practices." *Id.* ¶¶ 68–71. Sales representatives also would "arrange for and pay for lunches between referring doctors and doctors seeking to provide the THD service . . . so that doctors can convince referring primary care doctors to send patients to them for the THD procedure." *Id.* ¶ 72. And, THD's employee expense report policy "places no restrictions on the amount of money representatives can spend on" the lunches. *Id.* ¶ 73.

Further, Arthur alleges that THD "attempt[ed] to coax facilities into using its disposable light scopes by initially offering them for free and with the implication that the facilities could bill them to Medicare." *Id.* ¶ 82. Instead of relying on "other, more cost-effective options," such as reusable light scopes that are sanitized after every use, THD provided "high performing physicians" with non-reusable light scopes for free, which could then "be billed to Medicare every time a THD procedure [is] done, making the procedure even more profitable" for the physicians. *Id.* ¶¶ 81–83.

According to Relator, THD "encourage[d]" doctors to use "two unlawful billing procedures" to "potentially make THD a more profitable procedure: upcoding and unbundling." *Id.* ¶ 103. It is first necessary to understand that "[w]hen billing for a procedure, facilities typically rely on the AMA (American Medical Association) system of coding with CPT (Current Procedural Terminology) codes in order to attain proper reimbursement." *Id.* ¶ 94. Upcoding, according to

5

Relator, "involves using billing codes for procedures more serious and expensive than what was actually performed." *Id.* ¶ 105.

Specifically, Relator alleges that "THD encourage[d] physicians and facilities to upcode the THD procedure into a '2 part procedure': a ligation and a mucopexy." *Id.* This involves billing "an additional code for the 'hemorrhoid/mucopexy,' . . . because those terms are not mentioned in the" code definition for the THD procedure. *Id.* ¶ 106. In other words, Relator alleges that THD "encourages physicians to bill for a distinct and more serious condition than hemorrhoids *in addition to billing for hemorrhoid treatment*," *id.* ¶ 109 (emphasis in ECF 1), despite THD receiving repeated guidance that such billing is inappropriate. *Id.* ¶¶ 109, 113. And, in billing this way, Relator alleges that "Medicare is billed over double the amount it should have been for a conventional hemorrhoidectomy." *Id.* ¶ 116.

According to Relator, "[u]nbundling is the process through which a procedure that is inclusive of multiple components . . . is fragmented and instead billed as its individual units. Medicare will often time have lower reimbursement rates for the codes that are inclusive of procedures that are commonly performed together. By unbundling them, facilities illegally reap greater profits and overcharge Medicare for the same procedure." *Id.* ¶ 123.

The Complaint also alleges several "ways in which THD America has conspired to unlawfully market off-label uses of its devices." *Id.* ¶ 143. One way alleged by Relator is that THD "has been marketing the use of the THD procedure for use on Stage 4 hemorrhoids since 2008, despite lacking the necessary FDA approval . . . until February 24, 2015." *Id.* ¶ 133. Relator also cites evidence that suggests that the THD procedure has a higher recurrence rate and increased pain rate than alternative procedures. *Id.* ¶ 135. Despite this evidence, Relator claims that "THD makes a practice of marketing the profitability of its procedure over that of the basic

hemorrhoidectomy as the primary reason why physicians and institutions should favor its use," which "causes physicians and institutions to ignore the appropriateness of the THD procedure based on the needs and suitability of each particular patient." *Id.* ¶ 139.

Relevant here, in Count III the Relator alleged that defendant committed "acts in direct retaliation for Relator's efforts to reveal and properly disclose" defendant's illegal conduct. *Id.* at 54. Specifically, Relator claims that on several occasions she "raised concerns with her supervisors as to the potentially illegal behavior of THD". *Id.* ¶ 145. For example, Relator alleges that on April 19, 2015, she "detailed to her supervisor" that she was losing accounts as they stopped the practice of unbundling. *Id.* ¶ 146. The next day, she states that she raised concerns with her supervisors about the upcoding procedure. *Id.* ¶ 147. According to Relator, a facility "alerted" her to inaccurate information on THD's website and its concern that upcoding was "illegal." *Id.* Relator told her supervisors that without upcoding, "she would lose business, as the THD procedure would no longer be profitable to facilities." *Id.* In response, her supervisor said: "'Please stop writing about coding and billing issues.'" *Id.*

On April 29, 2015, Relator went to human resources at THD with her concerns of her supervisor's "inappropriate behavior," which she "felt was creating a hostile work environment for her." *Id.* ¶ 148. And, "Relator also detailed her many concerns with billing violations that had been occurring . . . and how she had brought it to the attention of her supervisors to no avail." *Id.* Two weeks later, Relator sent a follow-up email to HR to inquire about the status of her complaint but did not receive a response. *Id.* ¶ 149. On May 18, 2015, THD conducted an audit on Relator's reimbursements. *Id.* ¶ 150. A month later, on June 23, 2015, Relator told her direct supervisor that a facility was concerned that the Loan Generator Program could be seen as an inducement. *Id.* ¶ 151.

Relator was terminated from THD on July 1, 2015, for "gross violations." *Id.* ¶ 152. She alleges that "around the time she began raising her concerns with management, she had her expense reports audited" even though "she was not aware of" other employees being similarly audited. *Id.* The audit revealed that Relator submitted a flight reimbursement to and from Las Vegas instead of Oklahoma City, although she maintains "that this was an honest mistake and that the difference in flight fares was negligible." *Id.* Relator claims that she provided the proper documentation to THD following the audit and the reimbursement was corrected. *Id.* Nevertheless, Relator "was terminated with cause." *Id.* She claims that she "was concurrently offered separation benefits," which is "uncommon for gross violation terminations." *Id.* THD also offered Relator "an additional $8,500 in return for the general release of any legal claims she may have had." *Id.*

Relator filed the First Amended Complaint (ECF 10) on June 28, 2017, and on February 25, 2019, she filed the Second Amended Complaint (ECF 28). The First Amended Complaint made no substantive changes to the factual allegations but added Counts Five through Forty-Eight, alleging violations of various states' laws and a municipal code. The Second Amended Complaint made changes to the various state law claims.

From September 2017 to July 2024, during the government's investigation, the United States requested multiple extensions of time to decide whether to intervene in the case. *See* ECF 11, ECF 17, ECF 24, ECF 29, ECF 31, ECF 33, ECF 35, ECF 37, ECF 39, ECF 41, ECF 43, ECF 45, ECF 47, ECF 49, ECF 51, ECF 53, ECF 55, ECF 57, ECF 59, ECF 61. Those requests were consistently granted. *See* Docket.

Notably, in one request filed by the United States on March 15, 2018, along with an extension request, it sought an Order from the Court authorizing "a partial lift of the seal in this case so that the United States, at its discretion, may disclose to the defendant the allegations

asserted in the action along with the civil *qui tam* complaint." ECF 17 at 2. The motion was granted that same day. ECF 18. And, in another motion for an extension of time filed by the United States on February 7, 2020 (ECF 31), it states: "The Government and counsel for THD have met to discuss the allegations asserted in the relator's complaint. Counsel for THD has made a presentation respecting the allegations . . . ." ECF 31-1, ¶ 3. In other words, since at least March 2018, THD has been aware of the qui tam action.

On August 30, 2024, following a lengthy investigation, the United States intervened in part for purposes of settlement. ECF 63. In particular, the United States intervened as to "the Covered Conduct, as that term is defined in the Settlement Agreement," but declined to intervene as to all other claims. *Id.* at 1. The government also submitted a proposed order. ECF 63-1. It did not address service of the suit, however. *Id.* By Order of September 3, 2024 (ECF 64), the Court ordered the Clerk to unseal the Relator's Complaint, First Amended Complaint, and Second Amended Complaint.

On the same date, September 3, 2024, the United States filed a Stipulation of Dismissal of all claims (ECF 65), with the exception of the "Relator's claim under 31 U.S.C § 3730(d) against the Settling Defendants for expenses, attorneys' fees, and costs, and under 31 U.S.C § 3730(h)." *Id.* at 2. The government included a proposed order. ECF 65-1. Again, it did not address service of the suit. *Id.* By Order of September 5, 2024 (ECF 67), I approved the Stipulation. And, I added language to the proposed order, which directed the Clerk to unseal ECF 65 and ECF 65-1. *Id.* at 2.

Also on September 5, 2024, the states of Florida, California, Colorado, Connecticut, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Maryland, Michigan, Nevada, New Jersey, New Mexico, New York, Oklahoma, Tennessee, Texas, and Virginia (collectively, the "States"),

filed a "Joint Stipulation Of Dismissal," consistent with the terms of the settlement agreement executed by the parties. ECF 66. In a marginal Order of September 5, 2024 (ECF 68), I "approved." And, I mistakenly instructed the Clerk to "close the case." *Id.*

Two and a half months later, on November 22, 2024, counsel for the Relator moved to reopen the case. ECF 69. The request was granted that day. ECF 70.[4] The summonses were subsequently issued on November 27, 2024. ECF 73. On December 10, 2024, plaintiff moved to dismiss all defendants, except THD. ECF 74. The motion was granted by Order docketed that day. ECF 76.

On January 13, 2025, the Relator submitted a "Stipulation" (ECF 77) stating that the parties agree as follows: "By signing the Waiver of the Service of Summons, Defendant will not waive any defenses to the lawsuit, including any objections related to the timeliness of the service of the summons and complaint." *Id.* at 1. Counsel also included a "[Proposed] Order Granting Parties' Stipulation." ECF 77 at 3. By Order of January 13, 2025, I declined either to approve or reject the stipulation. ECF 78.

Plaintiff moved to file a Third Amended Complaint on March 6, 2025. ECF 79. She sought to "remove the underlying FCA claims and identify the relevant factual allegations supporting retaliation pursuant to 31 U.S.C. §3730(h)." ECF 79-1, ¶ 5. THD did not oppose the motion. *Id.* ¶ 6. By Order of March 7, 2025, I granted the motion. ECF 80. The Third Amended Complaint was docketed that day. ECF 81. It alleged twenty federal and state law claims against THD. *Id.*

---

[4] After the Court granted the motion to reopen the case, plaintiff filed an Amended Motion to Reopen the Case (ECF 71), explaining that the "previous version . . . did not include the adequate Certificate of Service," and the "Amended version" was "filed to remedy the error." Because I approved ECF 69, and notice has been provided, I shall deny ECF 71, as moot.

On March 20, 2025, defendant requested an extension of time to respond to the TAC. ECF 92. I granted the request that day. ECF 93. Then, on April 10, 2025, the Relator voluntarily dismissed Counts Two through Twenty of the TAC, leaving Count One remaining. ECF 99. I approved the voluntary dismissal that day. ECF 100.

Thereafter, on April 11, 2025, defendant moved to dismiss the TAC, pursuant to Fed. R. Civ. P. 12(b)(5), alleging untimely service. ECF 101. As stated, it is supported by a memorandum (ECF 101-4) and two declarations (ECF 101-2, ECF 101-3). The Declaration of Allison Caplis, Esq., counsel for THD, details interactions between counsel for THD and counsel for Relator regarding service of the Second Amended Complaint and filing of the Third Amended Complaint. ECF 101-2. The Declaration of Giuliano Spaggiari, a Director of THD, explains that "at least five individuals with knowledge related" to Arthur's retaliation allegations are no longer employed by THD, and THD does not have their contact information. ECF 101-3 at 1. But, Spaggiari's Declaration does not indicate how many employees with such knowledge remain available to THD. Nor does the Declaration indicate the efforts undertaken by THD to locate the individuals.

The Relator filed her Opposition to the Motion on May 7, 2025. ECF 105, ECF 105-1, along with the Declaration of Frank Xu, Esq., counsel for Arthur. ECF 105-2.[5] He details events related to service of the Second Amended Complaint. ECF 105-2. THD replied. ECF 106.

---

[5] As of May 1, 2025, the Relator had not responded to the Motion. In general, a response in opposition to a motion shall be filed within fourteen days of service of the motion. Local Rule 105.2(a). Therefore, by Order of May 1, 2025 (ECF 103), the Court asked counsel for the Relator to respond to the Motion, due by May 7, 2025, and advised that failure to comply with this Order may result in the dismissal of the case, without prejudice. *See, e.g.*, Fed. R. Civ. P. 41(b). Relator explains that counsel "erroneously calculated the response deadline and did not apply the Local Rules of the District of Maryland." ECF 105-1 at 1 n.1.

## II.    Standard of Review

As noted, this suit arises under the False Claims Act, § 31 U.S.C. §§ 3728 *et seq.* Section 3730(b)(2) provides, in part, that the suit "shall not be served on the defendant until the court so orders."

Pursuant to Fed. R. Civ. P. 12(b)(5), defendant moves to dismiss the Complaint for failure to effect timely service, as mandated by Fed. R. Civ. P. 4(m). *See* ECF 101. Rule 4(m) states, in part: "If a defendant is not served within 90 days after the complaint is filed, the court--on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice[6] against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."

Service of process, which is governed by Fed. R. Civ. P. 4, is a prerequisite to litigating in federal court. In its absence, a court lacks personal jurisdiction over the defendant. *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987); *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 228 (4th Cir. 2019).

Under Fed. R. Civ. P. 12(b), before submitting a responsive pleading, a defendant may move to dismiss a complaint, *inter alia*, for "(4) insufficient process" or "(5) insufficient service of process." Generally, "[a]n objection under Rule 12(b)(4) concerns the form of the process rather than the manner or method of its service," and a "Rule 12(b)(5) motion is the proper vehicle for challenging the mode of delivery or the lack of delivery[ ] of the summons and complaint." 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, Federal Practice and Procedure § 1353 (3d ed. 2004, Supp. 2021); *see Martin v. Big Apple Deli, LLC*, GLR-14-3042, 2015 WL 13103544, at *1

---

[6] Curiously, in the Motion, THD misquotes the rule, stating that the court "must dismiss the action *with prejudice* . . . ." (Emphasis added). ECF 101-4 at 9.

(D. Md. Nov. 19, 2015), *aff'd as modified*, 671 F. App'x 48 (4th Cir. 2016).  "Once service has been contested," as here, "the plaintiff bears the burden of establishing the validity of service pursuant to Rule 4."  *O'Meara v. Waters*, 464 F. Supp. 2d 474, 476 (D. Md. 2006); *accord, e.g., Kamara v. Univ. of Maryland*, GLS-20-3037, 2022 WL 1451645, at *2 (D. Md. May 9, 2022); *Johnson v. Azar*, GJH-20-2091, 2022 WL 874936, at *3 (D. Md. Mar. 24, 2022), *aff'd sub nom. Johnson v. Beccera*, 2023 WL 5524747 (4th Cir. Aug. 28, 2023) (per curiam); *Baylor v. Wegman's Food Market, Inc.*, WDQ-14-3330, 2015 WL 4396609, at *1 (D. Md. July 16, 2015).

The court can "construe Rule 4 liberally" when the service of process, even if technically deficient, provided actual notice to the defendant.  *O'Meara*, 464 F. Supp. 2d at 476.  But, the court cannot ignore the "plain requirements" for effecting service.  *Id.* (citation omitted); *see also Scott v. Md. State Dep't of Labor*, 673 F. App'x 299, 305 (4th Cir. 2016) (per curiam) ("Actual notice does not equate to sufficient service of process, even under the liberal construction of the rules applicable to a pro se plaintiff."); *see also Parrish v. Leithman*, 730 F. Supp. 3d 164, 169 (D. Md. 2024) ("However, this liberal construction does not give the Court license to permit a plaintiff to totally disregard the requirements of Rule 4.").

As indicated, if a plaintiff demonstrates "good cause," the court "must extend" the time for service.  Fed. R. Civ. P. 4(m).  "'Good cause' requires a 'showing of diligence on the part of the plaintiff[ ].'"  *Gelin v. Shuman*, 35 F.4th 212, 218 (4th Cir. 2022) (quoting *Attkisson v. Holder*, 925 F.3d 606, 627 (4th Cir. 2019)).  However, the decision of whether to dismiss the case for plaintiff's failure to comply with the requirements of Rule 4(m) is ultimately left to the court's discretion.  *See Gelin*, 35 F.4th at 220; *Tau v. Virginia Employment Commission*, 2022 WL 17750703, at *1 (4th Cir. Dec. 19, 2022) (per curiam).  The decision is "necessarily [] determined on a case-by-case basis . . . ."  *Scott*, 673 Fed. App'x at 306.  Thus, "[i]f good cause is not shown,

the Court may still choose to extend the time for service but is not required to do so." *Grier v. United States Dep't of Housing and Urban Development*, PWG-21-2165, 2022 WL 17467671, at *2 (D. Md. Dec. 6, 2022) (citing *Davis v. Univ. of N. Carolina at Greensboro*, WLO-19-661, 2022 WL 3586093, at *4 (M.D.N.C. Aug. 22, 2022)); *see also Tau*, 2022 WL 17750703, at *1 (vacating dismissal order and remanding because it was unclear whether the district court recognized that it had "discretion" to extend the timely service deadline under Rule 4(m), even without good cause).

"Federal courts have identified several non-exhaustive factors that may guide the discretionary decision of whether to enlarge the service period." *Brodnik v. Harris*, DAF-22-312, 2023 WL 2872684, at *2 (S.D. W. Va. Apr. 10, 2023). These factors include the following: "'(i) the possibility of prejudice to the defendant, (ii) the length of the delay and its impact on the proceedings, (iii) the reason(s) for the delay and whether the delay was within the plaintiff's control, (iv) whether the plaintiff sought an extension before the deadline, (v) the plaintiff's good faith, (vi) the plaintiff's pro se status, (vii) any prejudice to the plaintiff, such as by operation of statutes of limitation that may bar refiling, and (viii) whether time has previously been extended.'" *Id.* (quoting *Robinson v. G D C, Inc.*, 193 F. Supp. 3d 577, 580 (E.D. Va. 2016)); *see also Scott*, 673 F. App'x 299; *Kamara*, 2022 WL 1451645, at *3. Although the factors are not binding on a district court, *see Collins v. Thornton*, 782 F. App'x 264, 267 (4th Cir. 2019) (per curiam), these factors provide useful guidance to the court in the exercise of its discretion.

In exercising my discretion, I am reminded of another important principle. "Federal courts are here to resolve cases on the merits, to avoid procedural defaults whenever possible, and to issue the sanction of dismissal only in extreme cases of plaintiff misconduct." *Harris v. South Charlotte Pre-Owned Auto Warehouse*, LLC, MOC-14-307, 2015 WL 1893839, at *3 (W.D. N.C. Apr. 27,

2015) (citing *Choice Hotels Intern., Inc. v. Goodwin and Boone*, 11 F.3d 469, 471–72 (4th Cir. 1993)).

### III.    Discussion

Defendant asks the Court to "dismiss the entirety" of the TAC under Fed. R. Civ. P. 12(b)(5) for untimely service because Arthur "did not serve [defendant] within the ninety days allotted by Federal Rule of Civil Procedure 4(m)."  ECF 101-4 at 5.  Defendant argues, *id.* at 6: "Arthur's service was untimely, she has not and cannot establish any good cause for her delay, and this Court should not exercise discretion in Arthur's favor to the detriment of THD, particularly in light of Arthur's continued lack of seriousness in the pursuit of her claims as evidenced by the inclusion of the nineteen baseless state law claims added to the Third Amended Complaint and then voluntarily dismissed."

Relator contends that she "properly effectuated service on Defendant in accordance with 31 U.S.C. § 3730(b)(2)."  ECF 105-1 at 4.  She asks the Court to deny the Motion, claiming it "is baseless and nothing more than a procedural delay tactic to avoid addressing the merits of the case."  *Id*.

Both sides agree that Fed. R. Civ. P. 4(m) applies to FCA cases.  ECF 101-4 at 9 (THD); ECF 105-1 at 4 (Arthur).  *See Am. Civil Liberties Union v. Holder*, 673 F. 3d 245, 251 (4th Cir. 2011); *United States ex rel. Moore v. Cardinal Fin. Co. L.P.*, CCB-12-1824, 2017 WL 1165952, at *6 (D. Md. Mar. 28, 2017).  The dispute concerns the date on which the ninety-day service clock was triggered.

THD maintains that the ninety-day clock begins to run when a FCA suit is unsealed.  ECF 101-4 at 7.  In this case, the suit was unsealed on September 3, 2024.  *Id*.

Relator counters: "Until the court unseals the operative complaint and orders service, the 90-day clock for Plaintiff to serve Defendant under Rule 4(m) does not start." ECF 105-1 at 6. Quoting 31 U.S.C. § 3730(b)(2), Relator maintains that the qui tam complaint "'shall not be served on the defendant until the court so orders.'" ECF 105-1 at 6. According to Relator, the service clock here was triggered on November 22, 2024, when the case was reopened after it had been mistakenly closed. ECF 105-1 at 4. On that date, the Court directed the issuance of summons. ECF 70. In effect, that was a directive ordering service of the suit.

As stated, THD contends that the service clock was triggered when the Court unsealed the case on September 3, 2024. ECF 101-4 at 7; *see* ECF 64. According to THD, once the Court ordered the Complaint to be unsealed on September 3, 2024, Arthur then had ninety days to serve THD with a summons and complaint. *Id.* Defendant posits that this put the service deadline at December 2, 2024. *Id.* Yet, defendant asserts, *id.* at 11: "Arthur waited 106 days to serve THD— sixteen days more than the limit—and even then, service was improper because the operative complaint was not included. . . ."

Specifically, THD claims that sixteen days later, on December 18, 2024, Arthur "improperly served a summons on THD without including a copy of the operative complaint." *Id.* at 9. Therefore, on January 2, 2025, defendant advised counsel for Arthur of the omission of the operative complaint, "and proposed that for efficiency's sake THD's counsel would accept service of the Summons and Complaint." *Id.* Arthur's counsel provided a waiver of service form to THD's counsel shortly after, which THD returned on January 13, 2025. *Id.* at 7.

THD also complains that it expected to receive "a significantly curtailed complaint" given the settlements, but instead, on January 6, 2025, counsel for Arthur provided THD with a copy of the Second Amended Complaint, which "still contained all of the claims and allegations previously

dismissed." *Id.* at 8.  And, "after discussions with Arthur's counsel, THD counsel was under the impression that Arthur would amend her operative complaint (the Second Amended Complaint) to reflect only her surviving claims, relevant allegations and the remaining defendant." *Id.*  Instead, on March 7, 2025, Arthur filed the TAC, "containing nineteen entirely new retaliation claims under the laws of nineteen different states, in addition to the remaining claim from her previous complaints under 31 U.S.C. § 3730(h)." *Id.*  Counsel for THD and for Arthur met and conferred on March 25, 2025, and approximately two weeks later, Arthur promptly dismissed the state law claims.  *Id.* at 8–9.

In a qui tam case that has been pending for almost nine years, THD complains that the sixteen-day delay in service is "inexcusable" and is "prejudicial to THD because *any* delay diminishes THD's ability to defend itself given that the alleged conduct happened over nine years ago." *Id.* at 11 (emphasis in ECF 101-4).  Because "the acts on which Arthur bases her claims on [sic] allegedly occurred in 2015—almost a decade ago," THD insists that this "has already put THD at a disadvantage and every further delay diminishes THD's ability to defend itself against Arthur's claims, and is thus prejudicial." *Id.* at 14.  Moreover, defendant complains that Arthur "failed to act diligently" to effectuate service, *id.* at 12, and "cannot show good cause" for the delay. *Id.* at 13.

Relator posits that "the purported service issue arises from a clerical error by the Clerk's Office in prematurely closing the matter on September 5, 2024, after unsealing the operative complaint on September 3, 2024—a mistake outside of Plaintiff's control. Plaintiff prudently requested that the Court re-open the case." ECF 105-1 at 4.  According to Relator, "the appropriate date that could have triggered the 90-day period under the Federal Rules of Civil Procedure 4(m) was November 22, 2024, when Plaintiff filed a Motion to Reopen the Case as requested by the

Court, which was instantaneously granted on the same day." *Id.* Based on that date, Arthur claims that she "properly served Defendant within that 90-day period." *Id.*

Plaintiff recounts that on September 5, 2024, "the Court directed the Clerk to unseal the Stipulation of Dismissal filed by the United States of America." *Id.* at 5. And, on the same day, "the Court also directed the Clerk to close this case." *Id.* Then, on November 22, 2024, Relator contends that her "counsel called the Court to request a summons pursuant to Rule 4 of the Federal Rules of Civil Procedure. The case administrator informed Plaintiff's counsel of the following: 1) the case was closed and Plaintiff needed to file a Motion to Reopen the Case; and 2) Plaintiff was also required to file a Rule 4 Summons, after which the Clerk's Office would provide counsel with the electronic copy." *Id.*; *see also* ECF 105-2, ¶¶ 6, 8.

Arthur promptly filed the motion to reopen the case on November 22, 2024. ECF 69. The motion was granted that day. ECF 70. The "Court then issued the Rule 4 Summons on November 27, 2024." ECF 105-1 at 5; *see* ECF 73. On December 10, 2024, before the summons was served on the defendant, Relator voluntarily dismissed all defendants, except THD. *See* ECF 105-1 at 5; *see also* ECF 74. Then, on December 18, 2014, Relator claims to have "effectuated service of the summons along with the operative complaint to THD." ECF 105-1 at 5[7].

Relator explains that on January 2, 2025, THD's counsel advised counsel for Arthur by email that "it had not received the summons until December 31, 2025," and also that the operative complaint had not been provided. *Id.* According to Relator, "the operative complaint had not been properly uploaded for service by the service company," and on January 4, 2025, she informed THD "that the matter would be promptly addressed." *Id.* Then, on January 6, 2025, "Plaintiff

---

[7] Service is not reflected on the docket.

served Plaintiff's Second Amended Complaint and the summons issued as to Defendant." *Id.*; *see also* ECF 105-2, ¶ 11.

As indicated, Relator cites 31 U.S.C. § 3230(b)(2) for the proposition that the 90-day clock does not begin to run until the court orders service of the suit. ECF 105-1 at 6. According to Arthur, until this Court ordered service, "there was no deadline to effectuate service." *Id.* Realtor posits that although this Court "entered an Order unsealing the original Complaint, Amended Complaint, and Second Amended Complaint" on September 3, 2024, the Court "did not simultaneously order Plaintiff to serve Defendant." *Id.* Therefore, Arthur argues that the Rule 4(m) deadline was not triggered on that date. *Id.*

In Reply, defendant argues that Relator's argument is "nonsensical and is simply a thinly veiled attempt to obfuscate Plaintiff's repeated lack of diligence in prosecuting her case." ECF 106 at 3.

The claim as to Arthur's lack of diligence is unfounded. Qui tam suits are often protracted.[8] THD overlooks that between 2017 and 2024, while the government was investigating the case, the government filed numerous requests for extensions to determine whether to intervene. *See* ECF 11, ECF 17, ECF 24, ECF 29, ECF 31, ECF 33, ECF 35, ECF 37, ECF 39, ECF 41, ECF 43, ECF 45, ECF 47, ECF 49, ECF 51, ECF 53, ECF 55, ECF 57, ECF 59, ECF 61. In several orders entered by the Court granting an extension of the deadline to intervene, as requested by the government, the Court also ordered that "the Defendant shall not be served **until further Order by this Court, and then only as expressly detailed in the Court's order** . . . ." *See, e.g.*, ECF 30 at 2 (emphasis in ECF 30).

---

[8] In this Court's experience, qui tam investigations are often lengthy and the government customarily seeks many extensions in connection with its intervention decision. This is generally the reason for the protracted nature of these cases.

The proposed order (ECF 63-1) submitted by the United States with its "Notice Of Election To Intervene in Part for Purposes of Settlement . . . And Request To Unseal" (ECF 63), and its proposed order (ECF 65-1) submitted in connection with the "Stipulation Of Dismissal" (ECF 65), did not include a provision regarding an order of service.  And, on September 5, 2024, upon approval of the government's Stipulation Of Dismissal (ECF 65) and that of the States (ECF 66), the Court mistakenly directed the Clerk to close the case.  ECF 68.

It was not until November 22, 2024, when the case was reopened, that the Court ordered issuance of summons.  ECF 70.  The purpose of issuing a summons is, of course, for service of the suit upon the defendant.  Construed liberally, this was an Order to serve the suit.

In particular, by Order of November 22, 2024 (ECF 70), the Court ordered that:  (1) the case be reopened; (2) the Second Amended Complaint be reinstated, "limited to Relator's claim for relief for retaliatory actions under 31 U.S.C. § 3730(h) and Relator's claims for attorneys' fees, costs, and expenses under 31 U.S.C. §§ 3730(d),(h)"; and (3) "the Clerk shall issue summons upon the Relator's filing of the completed summons forms."  *Id.*

Although neither side cites *United States ex rel. Weiner v. Siemens AG*, 87 F.4th 157 (2d Cir. 2023) (per curiam), it is instructive.  In *Weiner*, the Relator filed a complaint against defendant alleging violations of the FCA and New York's False Claims Act.  *Id.* at 159.  The United States declined to intervene, but New York continued to request extensions for almost two years.  *Id.* at 160.  In December 2015, the court declined to exercise supplemental jurisdiction over the state law claims and ordered the seal to remain in place pending a status conference, to be requested by the Relator, about Relator's intent to continue to pursue the claims of the United States against the defendants.  *Id.*  Following this order, no action was taken for approximately two and a half years.  *Id.*  In June 2018, the United States wrote to the district court to request that the suit be unsealed.

*Id.* Four days after this request, the district court signed an order unsealing the Relator's complaint, the court's orders, and the United States's letter declining to intervene, but it was not docketed for over a year. *Id.* Another year went by after the order was docketed before the district court ordered the parties to file a status report, in September 2020. *Id.* Later that month, the Relator advised the court that he was ready to effectuate service following an order by the court instructing him to do so. *Id.* Thereafter, defendants moved to dismiss the Relator's complaint for insufficient service of process and failure to prosecute. *Id.* The district court granted in part and denied in part the motion to dismiss, on the ground that service was untimely because the Relator had not served defendants in the preceding nine years. *Id.* The court also declined the Relator's request for an extension for "good cause" under Rule 4(m). *Id.* The Relator appealed. *Id.* at 161.

On appeal, the Second Circuit considered the question of "whether the Rule 4(m) service of process clock begins to run when the district court unseals a *qui tam* action under the FCA even if the district court does not issue an order authorizing service." *Id.* The court looked to the statutory text of the FCA, which provides that "a *qui tam* complaint alleging violations of the FCA 'shall be filed in camera, shall remain under seal for at least 60 days, *and shall not be served on the defendant until the court so orders*.'" *Id.* (quoting 31 U.S.C. § 3730(b)(2)) (emphasis added). And, the statute also "provides that the defendant is not required to 'respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.'" *Weiner*, 87 F.4th at 161 (quoting 31 U.S.C. § 3730(b)(3)).

The court applied the well settled principles of statutory construction, 87 F.4th at 161, and said, *id.*:

> Section 3730(b)(2) forbids a relator from serving a *qui tam* complaint on the defendant "until the court so orders." 31 U.S.C. § 3730(b)(2). With this language,

Congress provided unambiguously that a relator may not lawfully serve process without a court order authorizing service. *See id.* Thus, it is only when a district court expressly "orders" a relator to serve a defendant that the Rule 4 period begins.

In addition, the court rejected the contention that § 3730(b)(3) "implicitly" provides "that the service period begins automatically at unsealing . . . ." *Id.* at 162. It reasoned that § 3730(b)(2) "explicitly commands that service is authorized only upon a court order." *Id.* The court added that "such a reading would render the plain language of Section 3730(b)(2) superfluous." *Id.*

The court also rejected defendants' argument that this reading of the FCA is "absurd" because it could lead to "'a state of suspended animation.'" *Id.* at 163 (citation omitted). The court stated that, even under its interpretation of the statute, "relators are not relieved of their duty to prosecute an action," and could still "face involuntary dismissal under Rule 41." *Id.*

Unlike in *Weiner*, years have not gone by since the government made its intervention decision, with no further prosecution efforts from plaintiff. Here, the government intervened, in part, in August 2024. ECF 63. Then, on September 3, 2024, the Court ordered the case to be unsealed. ECF 64. The United States and the States involved in this case stipulated to partial dismissal on September 3, 2024 and September 5, 2024, respectively. ECF 65, ECF 66. I approved. ECF 68. And, critically, I erroneously directed the Clerk to close the case. That is a far cry from a service order.

To be clear, a settlement was reached in the case as to all claims, with the exception of the Relator's retaliation claim and attorneys' fees and costs. ECF 65. To rectify the mistaken closure of the case, the Relator moved to reopen the case on November 22, 2024. ECF 69. That action was not as prompt as possible, but neither was it an undue delay. I granted the motion that day. ECF 70. Defendant does not dispute that Relator then attempted service upon defendant in December 2024.

In my view, the Second Circuit's analysis is directly on point here.  The Rule 4(m) period did not begin when the Court unsealed the case.  The earliest date triggering the Rule 4(m) period is November 22, 2024, following the Court's Order to reopen the case and issue summons.  ECF 70.

Defendant's claim of prejudice is completely specious.  As noted, THD has been on notice about this case since 2018.  At the request of the United States on March 15, 2018, the Court considered "a partial lift of the seal in this case so that the United States, at its discretion, may disclose to the defendant the allegations asserted in the action along with the civil *qui tam* complaint."  ECF 17 at 2.  The motion was granted that day.  ECF 18.  And, in the motion for an extension of time filed by the United States on February 7, 2020 (ECF 31), it states:  "The Government and counsel for THD have met to discuss the allegations asserted in the relator's complaint.  Counsel for THD has made a presentation respecting the allegations . . . ."  ECF 31-1, ¶ 3.

Indeed, the parties settled most of the claims by September 2024, before the service issue arose.  *See* ECF 65.  And, well before the service issue arose, THD knew that the retaliation claim was not resolved.  Defendant's suggestion of prejudice by what is at most a delay of service, even by defendant's own calculations, of about two weeks, is completely unfounded.

"Federal courts are here to resolve cases on the merits, to avoid procedural defaults whenever possible, and to issue the sanction of dismissal only in extreme cases of plaintiff misconduct."  *Harris*, 2015 WL 1893839, at *3 (citing *Choice Hotels Intern., Inc.*, 11 F.3d at 471–72).  There is no ground to dismiss the case on the basis of Rule 4(m) or Rule 12(b)(5).

## IV.    Conclusion

For the foregoing reasons, I shall deny the Motion.

An Order follows, consistent with this Memorandum Opinion.


Date:  May 28, 2025                              _____/s/_____

                                                Ellen Lipton Hollander
                                                United States District Judge